**In re Robert C. SNEED and Joseph C. Young, and E–Z Lay Pipe Corp. and Stream Line, Inc., Intervenors.**

**Appeal No. 82–604.**

United States Court of Appeals, Federal Circuit.

June 27, 1983.

---

seph F. Nakamura, Sol. and Fred E. McKelvey, Associate Sol., Washington, D.C.

Ned L. Conley, Houston, Tex., for intervenor, Stream Line, Inc. With him on the brief were David Alan Rose and Jeffrey W. Tayon, Houston, Tex., Jerry J. Dunlap and Gary Peterson, Oklahoma City, Okl., were on the brief for intervenor E–Z Lay Pipe Corp.

Before KASHIWA, Circuit Judge, SKELTON, Senior Circuit Judge, and MILLER, Circuit Judge.

JACK R. MILLER, Circuit Judge.

This appeal is from the decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") affirming the examiner's rejection of claims 1–18 in reissue application 966,740 under 35 U.S.C. § 103. Defendants in two district court actions for infringement of the patent for which reissue is sought were protestors below and are intervenors in this appeal. We affirm.

*Procedural Background*

Appellants Robert Sneed and Joseph Young were issued United States Patent No. 3,995,355 (the '355 patent)[1] on December 7, 1976, for "Laying of Flexible Pipe." In 1977 the assignee of the '355 patent, Fas-Line Sales & Rentals, Inc., brought infringement actions against E–Z Lay Pipe Corp., et al., in the United States District Court for the Western District of Oklahoma and against Stream Line, Inc., et al., in the United States District Court for the Western District of Texas. Thereafter, on December 5, 1978 (less than two years after their patent had issued), appellants filed application No. 966,740 for reissuance of the '355 patent. The district court actions have been stayed pending disposition of the reissue application. Appellants' reissue oath states that they seek reissue under 35 U.S.C. § 251 because, *inter alia,*

we have become aware of prior art relevant to patentability, not previously con-

Ronald G. Bliss, Houston, Tex., for appellant. With him on the brief was Jay M. Cantor, Washington, D.C., of counsel.

John W. Dewhirst, Washington, D.C., for appellee. With him on the brief were Jo-

1. Issued on application serial No. 591,540, filed June 30, 1975.

sidered by the Office, which might cause the examiner to deem the original patent wholly or partly inoperative or invalid, said prior art including numerous references discovered during the proceedings of two suits for infringement of said patent . . . .

### The Invention

Appellants' invention is a method for temporarily supplying water or gas to an oil drilling rig. Water is needed, *inter alia,* for mixing the drilling muds required in the drilling operation; natural gas is often used as a power source to drive the rig. A typical prior art method for supplying these fluids from a distant source to the rig involved laying 2 inch steel pipe on the surface of the ground from the source to the rig. This temporary line was made by threading together an appropriate number of 20 or 30 foot lengths of pipe. The operation was time consuming, dangerous, labor intensive, and resulted in a line prone to leakage at the joints.

Appellants' invention has to do with laying and retrieving a temporary line of flexible plastic pipe. Claim 1 is representative.

The method of temporarily connecting at a field site a supply terminal of a source of supply of fluid under pressure to a use terminal comprising:

a. placing flexible plastic pipe having a diameter of substantially 5 cm upon a vehicle reel mounted upon a wheeled vehicle,

b. connecting the flexible pipe for fluid transmission to one of said terminals,

c. moving the vehicle, thus

d. unreeling the flexible pipe from the reel,

e. connecting additional flexible pipe on a reel on the vehicle for fluid transmission to that already laid, thereafter,

f. moving the vehicle, thus

g. laying additional pipe,

h. continuing the steps of d), e), and f) until the other terminal is reached,

j. connecting the flexible pipe for fluid transmission to said other terminal,

k. thereafter, retrieving the temporarily laid flexible pipe by

m. severing the flexible pipe into segments the length of each segment of pipe being less than the length of flexible pipe filling one reel,

n. attaching a segment of flexible pipe to the vehicle reel,

o. providing a selectively engageable motor on the vehicle to rotate said reel,

p. reeling the attached segment onto the vehicle reel by engaging said motor and said reel,

q. moving the vehicle to another segment of flexible pipe, and

r. attaching said another segment to the segment of pipe already on the reel, and

s. reeling said another segment onto the vehicle reel,

t. continuing the steps q), r), and s), until the reel is full,

u. unreeling the pipe from the reel, and

v. continuing the steps n), o), p), q), r), s), t), and u), until all the segmented pipe is retrieved.

Other claims include such further limitations as joining the pipe segments by fusion, using a brake on the reel to maintain tension on the pipe as it is being unreeled, using more than one reel, and using pipe of approximately 5 cm. (about 2 inches) in diameter.

### The Prior Art

The record before the PTO includes two depositions of Troy L. Brown and a deposition of L.G. McLennan, both of whom testified that they used a method similar to the claimed method before the invention thereof by the appellants. Specifically, Brown states that he has been using truck-mounted reels for laying and retrieving 1½ inch diameter "plastic pipe" since about 1960. The pipes have been used to supply water

to drilling rigs operated by the company for which he works, Curt Brown Drilling Company. Brown's method comprises providing a reel wound with plastic pipe in the back of a truck; connecting one end of the pipe to the pump at the water supply; and driving slowly toward the drilling site, thereby unreeling the pipe. A person standing in the back of the truck controls the speed at which the pipe unwinds. The pipe segments are purchased in 500 foot lengths and are connected together with standard couplings and stainless steel clamps prior to spooling onto the reel. The pipe may be parted at these joints or in other places during the laying operation, e.g., to permit passing the pipe through a culvert.

The pipe is retrieved by severing the pipe into segments, draining the water, rolling the pipe onto the reel by rotating the reel (by hand), then driving to the next segment and repeating the process. Brown constructed a powered reel in 1973, but was plagued with breakdowns attributable to incorrect gearing and eventually abandoned the effort.

McLennan's deposition details an essentially similar process of laying and retrieving 1½ inch "plastic pipe" from truck mounted, nonpowered reels prior to appellants' date of invention.

United States Patent No. 3,346,213, to Nelson, teaches a hose reel assembly for laying and retrieving a collapsible irrigation hose. The Nelson reel is powered and has a brake assembly "so that the hose can be unwound or payed out from the reel in a controlled manner." Nelson teaches that his apparatus can handle hose having a length of "600 feet or more with a diameter of 4 inches or more . . . ."

*The Rejections*

The board affirmed the examiner's rejection of all the claims on either one of the Brown or McLennan depositions in view of the Nelson patent on the ground that it would have been obvious, within the meaning of 35 U.S.C. § 103, to modify the well-established laying and retrieving techniques of Brown or McLennan by utilizing a power reeling device as taught by Nelson. The PTO also relied on the following statement in the background portion of the specification under the heading "Description of the Prior Art":

> At the time of this invention there was flexible pipe made of plastic (the common commercial name for synthetic resin pipe) was [sic] available. Also, there was complete technology available and machines available for coupling two segments of the plastic pipe by fusion welding.

In addition, the examiner rejected all of the claims under 35 U.S.C. § 102(b) for public use or sale of the invention more than one year prior to the date the application for patent was filed. This rejection was reversed by the board but is argued by intervenors on appeal.

OPINION

Appellants attack the obviousness rejection on three principal fronts: (1) the definition of "flexible plastic pipe"; (2) the availability as prior art under 35 U.S.C. § 103 of the activities detailed in the Brown and McLennan depositions; and (3) the propriety of combining the teachings of the Nelson reference with the method disclosed in the Brown and McLennan depositions to support a holding of obviousness.

(1) *Flexible Plastic Pipe*

In an amendment after final rejection, the appellants limited their claims to a method utilizing pipe with a diameter of substantially or approximately 2 inches.[2] Accompanying the amendment and remarks

---

**2.** In what was, apparently, an effort to conform to nonmandatory PTO policy that measurements in patent applications be set out in metric units (*see* United States Patent and Trademark Office Manual of Patent Examining Pro-

cedure § 608.01 (4th ed. 1979)), the application and claims specify pipe of 5 cm. diameter. However, all of the proofs correspond to pipe of 2 inch diameter. In the absence of any contention to the contrary, we shall, for pur-

**1548**

was an affidavit from Jay C. Butler, who appears to be an expert on the characteristics of flexible plastic pipe, explaining that flexible plastic pipe, as used by the inventors and within the drilling industry, does not include 1½ inch and smaller sized lines. Mr. Butler stated:

> At the time of the invention, and to date, the use of the term "flexible plastic pipe" or [sic, as] used by the inventors pertains only to two-inch and three-inch polyethylene pipe and does not include 1½ inch and smaller diameter pipe. The reason for this is that the distance between the water source and the drilling rig is so great that the flow rate obtained within the the [sic] 1½ inch diameter and smaller sizes simply does not provide enough water or gas to the drilling rig. Thus, those in the oil field know and appreciate that, even though 1½ inch line is flexible in the strict sense of the word, only two-inch and three-inch polyethylene pipe can be considered flexible plastic pipe for purposes of reeling and unreeling in the oil field.

Mr. Butler then discussed the differences in rigidity, wall thickness, and weight of 1½ inch and 2 inch pipe. He concluded:

> Until the invention by Mr. Sneed and Mr. Young, the largest line used for reeling and unreeling was 1½ inch line. Inch-and-a-half line was limited in use because of its limited flow rate over longer distances. Thus, 1½ inch line was effectively ruled out in areas such as west Texas.

An affidavit by Robert Jehn, also relied on by appellants, states that "flexible plastic pipe" was used in 1974 to describe 2 and 3 inch pipe, but does not state whether it was also used to describe 1½ inch line.

The only substantive discussion of pipe diameter in the specification of the appealed application is under the heading "Description of the Prior Art":

> The terminal offering a source of supply of water and natural gas is often as much

poses of this appeal, treat the two as equiva-

as three kilometers away. Experience has shown that water or gas supplied under pressure in a pipe about 5 cm in diameter is sufficient to supply a drilling rig while in operation.

It is axiomatic that, in proceedings before the PTO, claims in an application are to be given their broadest reasonable interpretation consistent with the specification, *In re Prater,* 415 F.2d 1393, 1404, 56 Cust. & Pat.App. 1381, 162 USPQ 541, 550 (Cust. & Pat.App.1969), and that claim language should be read in light of the specification as it would be interpreted by one of ordinary skill in the art. *In re Johnson,* 558 F.2d 1008, 1016, 194 USPQ 187, 194 (Cust. & Pat.App.1977). Accepting appellants' definition of a person of ordinary skill in the art as "an oil field hand, such as a drilling superintendent," it is clear that both Brown and McLennan satisfy that definition. With that in mind, it is significant that both describe 1½ inch line as "plastic pipe." Brown also describes it as "flexible," and it is clear that the pipe used by McLennan was flexible. It is also instructive that affiant Butler refers to both 1½ inch and 2 inch line as "pipe," and that the American Petroleum Institute specifications submitted with the Butler affidavit refer to both 1½ inch and 2 inch line as "polyethylene line pipe." Those same specifications show that the pressure ratings of both 1½ and 2 inch SDR 11 polyethylene pipe (for which the Butler affidavit compared weight and wall thickness) are identical.

Our review of the record, the specification, and the arguments compels us to conclude that a person of ordinary skill in the art would have considered both 1½ inch and 2 inch polyethylene pipe to be "flexible plastic pipe." The specification and the evidence fail to support the gloss appellants seek to put on that term. The most significant difference between 1½ inch and 2 inch pipe is that the latter is stiffer, heavier, and can carry a greater volume of water due to its greater diameter. However, it is also

lent.

apparent that a 1½ inch pipe can and does carry sufficient water to supply an oil drilling rig under the conditions and in the circumstances for which such pipe has been used by Brown and McLennan. Regarding appellants' argument that 1½ inch pipe can-not supply sufficient water over distances of more than about one mile, we note that the claims do not contain a distance limitation, as such.

### (2) *The Brown and McLennan Depositions*

■ The Court of Customs and Patent Appeals, in the case of *In re Reuter*, 651 F.2d 751, 210 USPQ 249 (Cust. & Pat.App. 1981),[3] considered for the first time the use of affidavit and deposition evidence to establish prior art in protested reissue proceedings. The court rejected the argument that such evidence "cannot be used for any purpose," acknowledging instead that "evidence produced during an inter partes proceeding can be more reliable and complete than that produced in an ex parte proceeding due to its adversary nature." *Id.* at 758, 210 USPQ at 255. However, the question of whether and to what extent corroboration of such evidence is necessary received careful scrutiny. The court said:

> As to corroboration, the statement of an expert's opinion set forth in an affidavit need not be corroborated. However, corroboration may be necessary for other statements. In this case, Poynter, as an inventor, made statements regarding his alleged prior reductions to practice using model wings similar to appellants' claimed invention. The credibility of such statements must be established by clear and convincing evidence. [Citations and footnote omitted.]

*See also E.I. du Pont de Nemours v. Berkley & Co.*, 620 F.2d 1247, 1261, 205 USPQ 1, 11 (8th Cir.1980), and cases cited therein.

Accordingly, the critical question is whether the truth of the Brown and McLennan testimony has been established by clear and convincing evidence. We are satisfied that it has. It is instructive to consider the *differences* between the testimony in question and the Poynter affidavit, which the *Reuter* court held was "entitled to no weight." Perhaps the most important difference is that the Brown and McLennan testimony is deposition testimony developed during inter partes proceedings. Both Brown and McLennan underwent detailed and extensive examination and cross-examination; Poynter, on the other hand, merely signed a carefully worded affidavit, the allegations of which were not subject to cross-examination or rebuttal. The first Brown deposition and the McLennan deposition were taken during the discovery stages of the district court suits. Both witnesses recited dates, places, and names, stating that over a period of many years prior to appellants' invention they had publicly and commercially practiced a method similar to that claimed by appellants. Appellants tried without success to impeach their testimony and, in the nine months between the date of the depositions and the filing of the reissue application (and to this day), appellants have been unable to adduce any contrary evidence.

Independent circumstantial evidence also corroborates the testimony of Brown and McLennan. The record includes a newspaper clipping produced by Brown dated July 18, 1973 (well prior to appellants' June 30, 1975, filing date), which shows an oil rig with one of Brown's reels, spooled up with plastic pipe, in the foreground. The record also contains a photograph of one of the reels (still in existence) made for Brown around 1960; invoices showing dates and amounts of plastic pipe purchased; diary entries showing dates on which different drilling jobs were performed; and the deposition testimony of Leonard Lauener, who sold plastic pipe to Brown's firm and re-

---

**3.** The CCPA, in *In re Dien*, 680 F.2d 151, 214 USPQ 10 (Cust. & Pat.App.1982), held that it lacked jurisdiction over "no defect" reissue cases of the type involved in *Reuter*. However, this does not diminish the correctness of the statements in the *Reuter* opinion concerning corroboration and credibility. We note that the instant case is not a "no defect" reissue case.

called watching Brown's crew · spool the plastic pipe he had sold them onto the truck-mounted reels used by Brown in the practice of his method. Appellants have offered no reason to disbelieve this evidence; indeed, they appear to have tacitly accepted its truth. The Butler affidavit presented by appellants states: "Until the invention by Mr. Sneed and Mr. Young, the largest line used for reeling and unreeling was 1½ inch line." Appellant Sneed testified that he had no reason to disbelieve the testimony of Brown and McLennan.

In view of all the foregoing, we are satisfied that the truth of the Brown and McLennan testimony has been established by clear and convincing evidence and that it was, therefore, properly considered by the PTO in support of the obviousness rejection.

### (3) *Combining the Teachings of the References*

■ Appellants argue that Nelson should not be considered because it deals with collapsible hose rather than flexible plastic pipe and teaches that rolling 600 feet of 4 inch, noncollapsible hose into a transportable bundle is virtually "an insurmountable task." What appellants overlook is that it is not necessary that the inventions of the references be physically combinable to render obvious the invention under review. *Orthopedic Equipment Company, Inc. v. United States,* 702 F.2d 1005, 1013, 217 USPQ 193, 200 (Fed.Cir.1983); *In re Andersen,* 391 F.2d 953, 958, 55 Cust. & Pat.App. 1014, 157 USPQ 277, 281 (Cust. & Pat.App. 1968). Nelson clearly teaches that a reel used for laying and retrieving a line may be equipped with a selectively engageable motor or power drive means to rotate the reel and a brake to maintain tension on the line as it is being unreeled. Nelson's apparatus

is clearly within appellants' field of endeavor and, thus, is analogous art. That Nelson does not sever the line during retrieval, that he does not use pipe capable of supplying an oil rig, and that he arguably does not use flexible plastic pipe is immaterial, because those steps are taught by Brown and McLennan.

■ Accordingly, we hold that, at the time the invention was made, it would have been obvious to a person of ordinary skill in the art, with knowledge of Nelson's solution to the problems associated with reeling and unreeling heavy line, to incorporate a selectively engageable motor and a brake into a reel of the type used by Brown or McLennan and to use that motorized reel to lay and retrieve flexible plastic pipe.[4]

The failure of Brown's early attempt to motorize his reel is not persuasive of unobviousness for two reasons. First, Brown, apparently, did not have knowledge of the Nelson apparatus and, thus, lacked the guidance that reference provides. Second, and most important, Brown's failure was not due to his inability to motorize, but was due to his lack of motivation to do so. He recognized that his failure was from having used the wrong sprocket. He did not correct that problem because he was satisfied with the ability of his crew to lay and retrieve pipe by hand and he was worried that the roughnecks would not properly handle a motorized reel.

We further hold that the difference between a method using 1½ inch pipe and one using 2 inch pipe would not have rendered the latter unobvious. The solution to any problems of weight and stiffness inherent in scaling up to 2 inch pipe is clearly shown in the apparatus of Nelson.[5] Nor is there unobviousness in using more than one reel

---

4. We note that, contrary to appellants' argument, claims in a reissue *application* enjoy no presumption of "validity." *See In re Doyle,* 482 F.2d 1385, 1392, 179 USPQ 227, 232–33 (Cust. & Pat.App.1973).

5. Appellants' arguments regarding the possibility that the "memory" of the pipe might cause

a "snaking" problem on unreeling and might create problems during retrieval are directed to a problem that, apparently, never materialized. Moreover, although unbeknown to appellants and their pipe supplier, such problems, if any, had already been solved, albeit on a smaller scale, by Brown and McLennan.

when laying or retrieving lengthy lines. To the extent that appellants rely on the fusion limitation, we are persuaded that utilization of such an admittedly well-known technique for joining plastic pipe would have been well within the skill of the art.

Finally, we conclude that the requisite nexus between the claimed invention and its alleged commercial success has not been established. Appellants rely on the gross sales figures of Fas-Line Sales & Rentals, Inc. ("Fas-Line"), appellant's assignee. However, it is uncontested that Fas-Line's business was not limited to practicing the claims on appeal; rather, it also included pipe rentals and permanent installations. There has been no allocation of the sales figures among the various aspects of Fas-Line's business. Accordingly, it is impossible to ascertain to what extent practice of the claimed invention was responsible for Fas-Line's success. *See Douglas v. United States,* 510 F.2d 364, 370, 206 Ct.Cl. 96, 184 USPQ 613, 618 (Ct.Cl.1975). Additionally, appellant Sneed's testimony indicates that the reason plastic pipe was not used as extensively in the past as it is today is that it was not perceived to be a very good product.[6] Thus, Fas-Line's increasing sales figures could well be attributable to the increasing popularity of flexible plastic pipe in general, rather than to the merits of appellants' particular method of laying and retrieving it.

In view of the foregoing, the decision of the board is affirmed.[7]

AFFIRMED.

---

**6.** Sneed stated:

When we speak of plastic pipe, ten years ago it was a plastic pipe. It is known now as polyethylene pipe. The plastic pipe back when we were referring to it was plastic and not a very good product.

Now, the installation of polyethylene into the plastics have made a more desirable line, hence the reason for the period of time in there when no one used it.

**7.** Because this holding is dispositive, we do not reach intervenors' argument regarding the board's reversal of the 35 U.S.C. § 102(b) rejection; nor do we consider our jurisdiction to entertain such an argument. That our opinion on the issue would be helpful to the district courts in the stayed infringement suits if and when the question of attorneys' fees is raised is immaterial, because this court does not have power to issue advisory opinions. *See In re Dien, supra* note 3.