**A. F. STODDARD & COMPANY, LTD., Appellant,**

v.

**C. Marshall DANN, Commissioner of Patents.**

**No. 76–1777.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 10, 1977.

Decided Aug. 26, 1977.

---

Thomas M. Gibson, New York City, with whom Joseph Y. Houghton, Washington, D. C., and John L. Welch, New York City, were on the brief, for appellant.

Jack E. Armore, Associate Sol., Washington, D. C., with whom Joseph F. Nakamura, Sol., Washington, D. C., was on the brief, for appellee.

Before WRIGHT and MacKINNON, Circuit Judges, and HOWARD T. MARKEY *, Chief Judge, United States Court of Customs and Patent Appeals.

Opinion for the Court filed by Chief Judge MARKEY.

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals:

Appeal by A. F. Stoddard & Co., Ltd. ("Stoddard"), from the order of the District Court denying Stoddard's motion for summary judgment, granting the cross-motion for summary judgment of the Commissioner of Patents and Trademarks, and dismissing Stoddard's complaint filed under 35 U.S.C. § 145 (1970).[1] Stoddard is assignee of two patent applications, application Serial No. 220,454 [2] (the "continuation application") and application Serial No. 355,695 [3] (the "reissue application").

In this case of first impression, the sole question of law is: If, *through innocent error*, W was named as the inventor in a patent application and it is later discovered that H was the true inventor, can the error be corrected by diligent action upon its discovery? The District Court answered in the negative. We reverse and remand.

## THE FACTS

The facts are undisputed and may be summarized as follows:

The actual inventor of the subject matter claimed [4] in the two applications is Jean J. Hospied, a Belgian citizen. Hospied was employed by Vernier Carpet at the time of the invention. He later served as Director of the Societe de Construction et de Recherches et d'Application (SOCORAP), a Belgian corporation. SOCORAP and Ver-

nier Carpet had an agreement with Societe d'Etudes et Recherches et d'Exploitation d'Inventions Nouvelles Establishment (SEREINE) by which all inventions in the subject matter area by Hospied became the property of SEREINE.

A single patent application, which encompassed the subject matter of the two U.S. applications here in issue, was prepared by Maurice DeBrabanter, a Belgian patent agent, and was filed in Belgium on October 11, 1965, as Belgian application Serial No. 18,931. In accordance with Belgian law, Olaf F. Walser, the Director of SEREINE, executed the necessary application papers as representative of the owner, SEREINE.

On October 4, 1966, U.S. patent application Serial No. 584,249 (the "parent application") was filed in the U.S. Patent and Trademark Office ("PTO"), claiming the benefit of the filing date of Belgian application Serial No. 18,931 under 35 U.S.C. § 119. The place for signature of the inventor on the declaration for the parent U.S. application erroneously contained the signature of Walser on behalf of SEREINE. The error was made innocently and without deceptive intention.

The PTO determined that two separate inventions were present in the parent application, and a restriction requirement was made under 35 U.S.C. § 121. No additional declarations were required or made. The reissue and continuation applications here involved were derived from that single parent application.

On September 12, 1972, U.S. Patent No. 3,691,069 issued on one of the two U.S. applications. The other application, the continuation application, remained pending under examination in the PTO. Thereaft-

---

* Sitting by designation pursuant to 28 U.S.C. § 293(a).

1. The District Court, whose decision is unreported, heard oral arguments on the cross-motions, ruled briefly from the bench, and issued the appealed order.

2. Filed January 24, 1972. A continuation of a division of application Serial No. 584,249 filed October 4, 1966.

3. Filed April 30, 1973. To reissue U.S. Patent 3,691,069 issued September 12, 1972 from a continuation of application Serial No. 584,249 filed October 4, 1966 (*supra*, note 2).

4. The claims are not material and are not reproduced.

er, the error was discovered and Walser and Hospied were so advised by their U.S. patent attorneys. All parties having an interest in the issued patent and in the pending continuation application were diligent in their efforts to correct the error once it had been discovered.

On April 30, 1973, Stoddard filed the instant reissue application to correct the error in U.S. Patent No. 3,691,069. Hospied, the true inventor, executed the declaration for the reissue application. Also on April 30, 1973, Stoddard requested the PTO to amend the pending continuation application by correcting the original declaration to show Hospied as the actual inventor. A declaration of inventorship was signed by Hospied and filed with this request to replace the earlier declaration. In both instances, Stoddard explained in detail the nature of the error and the manner in which it arose.

The patent examiner finally rejected the continuation and reissue applications on the ground that the inventorship corrections requested could not be made under 35 U.S.C. § 116.[5] Therefore, the examiner rejected all of the claims in the continuation application under 35 U.S.C. § 102(f)[6] and all of the claims in the reissue application under 35 U.S.C. § 251.[7]

---

5. 35 U.S.C. § 116 (1970) provides:
   § 116. Joint inventors.
   When an invention is made by two or more persons jointly, they shall apply for patent jointly and each sign the application and make the required oath, except as otherwise provided in this title.
   If a joint inventor refuses to join in an application for patent or cannot be found or reached after diligent effort, the application may be made by the other inventor on behalf of himself and the omitted inventor. The Commissioner, on proof of the pertinent facts and after such notice to the omitted inventor as he prescribes, may grant a patent to the inventor making the application, subject to the same rights which the omitted inventor would have had if he had been joined. The omitted inventor may subsequently join in the application.
   Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes.
   A companion provision is 35 U.S.C. § 256 (1970):
   § 256. Misjoinder of inventor.
   Whenever a patent is issued on the application of persons as joint inventors and it appears that one of such persons was not in fact a joint inventor, and that he was included as a joint inventor by error and without any deceptive intention, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate deleting the name of the erroneously joined person from the patent.
   Whenever a patent is issued and it appears that a person was a joint inventor, but was omitted by error and without deceptive intention on his part, the Commissioner may, on application of all the parties and assignees, with proof of the facts and such other requirements as may be imposed, issue a certificate adding his name to the patent as a joint inventor.
   The misjoinder or nonjoinder of joint inventors shall not invalidate a patent, if such error can be corrected as provided in this section. The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned and the Commissioner shall issue a certificate accordingly.

6. 35 U.S.C. § 102(f) (1970) provides:
   § 102. Conditions for patentability; novelty and loss of right to patent.
   A person shall be entitled to a patent unless—
   *   *   *   *   *   *
   (f) he did not himself invent the subject matter sought to be patented * * *.

7. 35 U.S.C. § 251 (1970) provides:
   § 251. Reissue of defective patents.
   Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.
   The Commissioner may issue several reissued patents for distinct and separate parts of the thing patented, upon demand of the applicant, and upon payment of the required fee for a reissue for each of such reissued patents.

## THE BOARD

On appeal to the PTO Board of Appeals ("board"), the rejections were affirmed in separate 2–1 decisions.

With respect to the continuation application, the board majority stated in part:

On April 30, 1973, and May 15, 1973, papers seeking to change the named inventorship of this application from Olaf F. Walser to Jean J. Hospied were filed. These papers included declarations by Walser, Hospied, Maurice DeBrabanter (a Belgian patent agent), and Andre Vernier (Hospied's employer). The various declarations are to the effect that:

(1) Hospied, and not Walser, is the actual inventor of the subject matter of the here involved application, as well as of the parent applications;

(2) Walser is the Director of the company to which Hospied was obligated to assign his patent rights with respect to the involved subject matter;

(3) Walser mistakenly believed that he as Director of the company was the only person who could sign the United States application and he therefore executed the declaration accompanying Serial No. 584,249 in his capacity "as owner of the patent";

(4) Walser signed other applications for patent in countries other than the United States;

(5) Walser, Hospied and Vernier are not familiar with the patent laws of the United States;

(6) Walser does not speak English fluently.

The Examiner refused to convert the inventorship of the application from Walser to Hospied on the ground that 35 USC 116 does not authorize the deletion of the name of one sole inventor and the substitution therefor of the name of another sole inventor. The Examiner then reject-

The provisions of this title relating to applications for patent shall be applicable to applications for reissue of a patent, except that application for reissue may be made and sworn to by the assignee of the entire interest if the application does not seek to enlarge the scope of the claims of the original patent.

ed the claims under 35 USC 102(f) and thereafter this appeal was filed.

\*   \*   \*   \*   \*   \*

Except in certain specified instances, the United States patent laws require that an application for a patent be made by the inventor of the subject matter sought to be patented. See 35 USC 101, 111 and 115. The specified statutory exceptions to the requirement that the inventor apply for a patent are contained in 35 USC 116, second paragraph, 117 and 118. These last aforementioned sections are not here applicable. The patent laws (35 USC 116, third paragraph) additionally permit the amending of an application to correct the named inventorship to add the name of a joint inventor whose name was omitted or to delete the name of a person who was incorrectly named as a joint inventor. However, there is no provision in the law permitting the substitution of the name of one person for the name of another person who had incorrectly applied for the patent in his own name as sole inventor. Indeed, according to Mr. Federico's commentary * on the

\* "Commentary On The New Patent Act," by P. J. Federico, 35 U.S.C.A., pp. 1–70, at p. 28.

patent statutes, an application filed in the name of "A as inventor . . . cannot be amended to become the application of C as inventor . . .." Mr. Federico's view on this subject appears to be shared by at least some members of the judiciary as is evident from the comments by the courts concerning section 256, which section parallels 116, in such cases as *Rival Mfg. Co. v. Dazey Products Co.,* D.C., 358 F.Supp. 91, 177 USPQ 432, 439, and *Garrett Corp. v. United States,* 422 F.2d 874, 190 Ct.Cl. 858, 164 USPQ 521, 526. Each of the aforementioned cases cites *Koehring Co. v. Etnyre and Co.,* D.C., 254 F.Supp. 334, 149 USPQ 263.

No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.

Although we have been unable to find any prior decision by the Board of Appeals or of any court involving the precise facts of this case, that is, amending an application of a sole named inventor to change the application to that of another sole inventor, we have reached the conclusion that such a change is not permitted or contemplated by the present patent laws.

\* \* \* \* \* \*

Insofar as the dissenting opinion \* \* is predicated upon the permissibility of correcting a defective oath, it appears to overlook the fundamental requirement of United States patent law that the application for a patent must be made by the inventor of the subject matter sought to be patented; 35 U.S.C. 111. This fundamental principle is well expressed by Robinson in his classic treatise "The Law of Patents for Useful Inventions," Volume I (1890), sections 362 and 363, at pages 521 to 523 \* \* \*. We note that Robinson states "this principle [the true inventor must apply for a patent] is expressly formulated both in the Constitution and Acts of Congress." Thus, the filing of an application by one who is not the inventor of the subject matter is in effect a nullity. [Bracketed matter is in board's opinion.]

With respect to the reissue application, the board majority stated in part:

Although we may sympathize with the position in which the appellant now finds himself, we are constrained to agree with the conclusion reached by the Examiner. In our view, section 251, even if most liberally construed, does not authorize the reissuance of the Walser patent in the name of Hospied.

\* \* \* [W]e are of the view that the United States patent laws do not permit an application filed in the name of one individual as sole inventor to be amended to substitute the name of another person as sole inventor. It would be inconsistent to permit a complete change in inventor-ship by reissue, which change could not have been accomplished during the pendency of the application which matured into the patent for which a reissue is sought. To hold otherwise would permit one to do by indirection that which he cannot do directly. See 35 USC 251, third paragraph, which states that the requirements of the statute relating to applications "shall be applicable to applications for reissue . . . ." Our decision here is not inconsistent with the decision in [*Ex parte*] Scudder [169 USPQ 814 (Pat.Off.Bd.App.1971)] since in that case the change sought was of the type permitted during the pendency of the application.

## THE DISTRICT COURT

The District Court's statement from the bench, in its entirety, was:

The case is before the Court on cross-motions for summary judgment. The Court has considered those motions and the statements of material facts concerning which there are no genuine issues.

Both parties recognize the fact that the only matters here are matters of law and that they seem to be two basic issues. The first is whether under the patent laws, an application filed in the name of a person claiming to be a sole inve[n]tor may be amended to substitute the name of another person as a sole inventor where there was no deceptive intent in incorrectly filing the original application. And second, as to the reissue, is whether a patent issued in the name of a sole inventor can be reissued in the name of another person as to the sole inventor where there was no deceptive intent originally filed in the application.

The Court finds that there is no genuine issue of a material fact and that the defendant is entitled to judgment as a matter of law. Accordingly, the defendant's motion for summary judgment is granted and plaintiff's cross-motion for summary judgment is denied.

## OPINION

### I. *The Constitutional Objectives*

The Constitution provides: [8]

> The Congress shall have Power * * To promote the Progress of * * * useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their * * * Discoveries * * *.

The board in effect considered the Constitution as requiring that the true inventor must *apply* for a patent, citing Professor Robinson's treatise. However, neither the Constitution nor Professor Robinson supports that view.

█ The Constitution speaks of *securing* to inventors the exclusive right to their discoveries, not that the inventor must *apply*. Thus, the Constitution is result-oriented and contemplates that the *grant* of the patent be to the inventor, either directly or through his assignee.

Professor Robinson stated the principle:

> § 362. Patent Privilege Grantable only to Inventors.
>
> The exclusive public use of an invention can justly be secured by law to no person except its inventor. To his creative faculties alone is due the new idea or means, and to him only can rightfully belong the art or instrument in which that idea is embodied. From him the public have received, or are about to receive, all the benefits conferred upon them by the invention, and solely to him do they therefore owe the recompense which finds expression in the privilege conceded by a patent. This is a fundamental principle, not merely of natural justice, but of positive law. The common law recognized no letters-patent as valid unless the grantee were the inventor of the article or manufacture covered by the grant. The statute of James I., herein declaring and affirming the common law, forbade the issue of such letters to any one except the first and true inventor of the substance or the operation patented; and though the theory prevailing in the English courts as to the nature of the inventive act embraced the enterprise, risks, and expenditures of an importer as well as the originating activities of a creator, the principle was still intact that he who first within the realm possesses the invention and bestows it on the public is alone entitled to be temporarily protected in its ownership, and to enjoy the reward which a service freely rendered to the public properly demands.
>
> § 363. Patent Privilege Grantable only to Inventors: but to Inventors Irrespective of Age, Sex, or Coverture.
>
> In the United States this principle is expressly formulated both in the Constitution and the acts of Congress. Without a change in the language of the Constitution, no patent could be conferred except upon an inventor, and for his own invention or discovery. [1 W. Robinson, *The Law of Patents*, 521–22 (1890).]

█ Thus, the fact that the true inventor was not named in the parent U.S. application (1966) raises no constitutional bar to the inventorship corrections sought here. To the contrary, the constitutional objective of *granting* a patent (or a reissue patent) *to* the true inventor will be, and can only be, served by permitting the requested correction.

It must be emphasized that the present case involves an *innocent* error, i. e., an error "without any deceptive intention" as reflected in the language of 35 U.S.C. §§ 116, 251, and 256 (*supra*, notes 5 and 7).[9]

---

**8.** Art. I, Sec. 8, Cl. 8.

**9.** In the three cases cited by the board (*Garrett Corp. v. United States*, 422 F.2d 874, 190 Ct.Cl. 858, 164 USPQ 521, *cert. den.*, 400 U.S. 951, 91 S.Ct. 242, 27 L.Ed.2d 257, 167 USPQ 705 (1970); *Rival Mfg. Co. v. Dazey Products Co.*, 358 F.Supp. 91, 177 USPQ 432 (W.D.Mo.1973); *Koehring Co. v. E. D. Etnyre & Co.*, 254 F.Supp. 334, 149 USPQ 263 (N.D.Ill.1966)), the error in inventorship was known or suspected, but no steps had been taken to correct the error. The leading case of *Kennedy v. Hazelton*, 128 U.S. 667, 9 S.Ct. 202, 32 L.Ed. 576 (1888), also involved a patent application executed by one who was known not to be the inventor, prompting the Supreme Court's statement that the patent was "void." (*Id.* at 672, 9 S.Ct. 202.)

■ Chief Justice Marshall, in *Grant v. Raymond*, 31 U.S. (6 Peters) 218, 8 L.Ed. 376 (1832), explained the basic judicial policy of justice and equity which must govern this case:

> To promote the progress of useful arts, is the interest and policy of every enlightened government. It entered into the views of the framers of our constitution, and the power "to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries," is among those expressly given to congress. This subject was among the first which -followed the organization of our government. It was taken up by the first congress at its second session, and an act was passed authorising a patent to be issued to the inventor of any useful art, &c. on his petition, "granting to such petitioner, his heirs, administrators or assigns, for any term not exceeding fourteen years, the sole and exclusive right and liberty of making, using, and vending to others to be used, the said invention or discovery." * * * It [the patent] is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made; and to execute the contract fairly on the part of the United States, where the full benefit has been actually received: if this can be done without transcending the intention of the statute, or countenancing acts which are fraudulent or may prove mischievous. The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen [now seventeen] years, is preserved; and for his exclusive enjoyment of it during that time the public faith is pledged. That sense of justice and of right which all feel, pleads strongly against depriving the inventor of the compensation thus solemnly promised, because he has committed an inadvertent or innocent mistake. [*Id.* at 241–42.]

Thus, one of the constitutional objectives is to establish a patent system based on justice, wherein honesty and candor are encouraged, not penalized. Indeed, as with all human systems, the patent system cannot stand if long sullied by dishonesty; it, like all of mankind's endeavors, must be constantly nourished and given strength by daily and continuing infusion of candid fairness. The dependency of the PTO upon counsel for applicants, with respect to information not normally available to the PTO, is often and rightly cited as requiring full and open disclosure by applicants. But justice, if it is to result from honesty and candor, must be a two-way street, on which both applicants and the government travel.

The *quid pro quo* which supports the patent grant is the requirement of a full *disclosure* regarding the invention; indeed, the very purpose of the patent system is to encourage disclosures. Chief Justice Burger described this constitutional objective in *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 480–81, 94 S.Ct. 1879, 1885–1886, 40 L.Ed.2d 315, 181 USPQ 673, 678 (1974):

> The stated objective of the Constitution in granting the power to Congress to legislate in the area of intellectual property is to "promote the Progress of Science and useful Arts." The patent laws promote this progress by offering a right of exclusion for a limited period as an incentive to inventors to risk the often enormous costs in terms of time, research, and development. The productive effort thereby fostered will have a positive effect on society through the introduction of new products and processes of manufacture into the economy, and the emanations by way of increased employment and better lives for our citizens. In return for the right of exclusion—this "reward for inventions," *Universal Oil Co. v. Globe Co.*, 322 U.S. 471, 484 [64 S.Ct.

1110, 88 L.Ed. 1399] (1944)—the patent laws impose upon the inventor a requirement of disclosure. To insure adequate and full disclosure so that upon the expiration of the 17-year period "the knowledge of the invention enures to the people, who are thus enabled without restriction to practice it and profit by its use," *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 187 [53 S.Ct. 554, 77 L.Ed. 1114] (1933), the patent laws require that the patent application shall include a full and clear description of the invention and "of the manner and process of making and using it" so that any person skilled in the art may make and use the invention. 35 U.S.C. § 112. When a patent is granted and the information contained in it is circulated to the general public and those especially skilled in the trade, such additions to the general store of knowledge are of such importance to the public weal that the Federal Government is willing to pay the high price of 17 years of exclusive use for its disclosure, which disclosure, it is assumed, will stimulate ideas and the eventual development of further significant advances in the art. [Footnote omitted.]

■ Applying the views of Chief Justice Marshall and Chief Justice Burger, we note first that there has been a full and adequate disclosure of the inventions in the present case. On the record here the inventions are themselves patentable. One patent has issued and its reissue is now sought. A patent based on the continuation application appears warranted. The filing documents show Walser as the inventor. We now know that the inventor was Hospied. To permit the requested substitution of names would on this record harm no one.[10] To deny the requested correction, on the other hand, would serve no useful purpose, would frustrate the constitutional objective, would exalt form over substance, and would punish Stoddard's commendable candor, all

to the injury of the patent system and to him to whom it must appeal, i. e., the inventor. The United States has fully received its *quid pro quo*, the disclosures, one of which has been published and the other is to be published upon correction of the inventor's name, and should not now deny the formal step requested. A denial would, in sum, violate that "sense of justice" which Chief Justice Marshall saw as pleading "strongly against depriving the inventor" just "because he has committed an inadvertent or innocent mistake," *Grant v. Raymond, supra*, and could preclude the "positive effect on society" referred to by Chief Justice Burger in *Kewanee, supra*.

## II. *The Inventive Entity*

No statutory provision expressly authorizes the requested correction, whereby an inventive entity represented by one signature (Hospied) may be substituted for another inventive entity represented by one other signature (Walser's). The statutes, 35 U.S.C. §§ 117 and 118 (1970), do, however, expressly provide for acceptance of applications and issuance of patents where the application is filed in the name of an inventive entity not represented by any signature:

§ 117. Death or incapacity of inventor.

Legal representatives of deceased inventors and of those under legal incapacity may make application for patent upon compliance with the requirements and on the same terms and conditions applicable to the inventor.

§ 118. Filing by other than inventor.

Whenever an inventor refuses to execute an application for patent, or cannot be found or reached after diligent effort, a person to whom the inventor has assigned or agreed in writing to assign the invention or who otherwise shows sufficient proprietary interest in the matter justifying such action, may make applica-

---

**10.** We have no reason to suppose that counsel for applicants will mistake the result herein as providing excuse for less than the careful determination of true inventorship required prior to filing. The inadvertence and innocent error is here undisputed. The PTO has both the right and duty to assure itself, in each case, of the presence of innocent error, without deceptive intention, before permitting substitution of an inventor's name.

tion for patent on behalf of and as agent for the inventor on proof of the pertinent facts and a showing that such action is necessary to preserve the rights of the parties or to prevent irreparable damage; and the Commissioner may grant a patent to such inventor upon such notice to him as the Commissioner deems sufficient, and on compliance with such regulations as he prescribes.

Further, the statute, 35 U.S.C. § 116 (*supra*, note 5), provides for substituting for the inventive entity originally represented by two or more signatures, an inventive entity represented by one of said signatures, and for substituting for an inventive entity originally represented by one signature, an inventive entity represented by that signature plus one or more additional signatures, so long as error arising without deceptive intent is shown. Although, in either case under § 116, the signature of at least one of the actual inventors will have appeared in the original application, and the name of at least one inventor will appear in the papers under § 117 and § 118, the clear thrust of §§ 116, 117 and 118 is to encourage disclosure of inventions, in accord with the constitutional objective discussed above, even though the signature or signatures of the true inventive entity may be either incorrect or entirely absent. Moreover, an application filed jointly when only one of the listed inventors made the invention, is not filed in the name of the true inventive entity. So too, an application filed in the name of one inventor, when the invention was truly made by more than one, is not filed in the name of the true inventive entity. Section 116 thus makes plain the absence from the statute of substantive objection to the substitution of the correct inventive entity for an innocently incorrective inventive entity.

Though not expressly authorizing the correction here requested, the statute is equally devoid of any express prohibition thereagainst. 35 U.S.C. § 111 (1970) does require an oath "by the applicant" and that the application be signed "by the applicant." Though it is true that "applicant" is at many places in the statute a synonym for "inventor," §§ 117 and 118 recognize the filing of applications by executors and assignees, i. e., by "applicants" other than the inventor. In the present case, the parent application was filed by an assignee (by mesne assignments) of the true inventor and thus by a true party in interest in the application.[11] The parent application was thus filed by an applicant capable of recognition by the PTO and was not, under any statutory provision, a nullity. Indeed, once an assignment of an application is filed, the PTO will deal with the assignee or the assignee's counsel (37 C.F.R. § 1.32 (1976)) and will issue the resulting patent to the assignee of record at the time of issuance (35 U.S.C. § 152 (Supp. V 1975)). In the case of an assigned application, therefore, it is of no import to the PTO, in the ordinary examination of the application or in the issuance of the patent, absent questions of prior publication within one year before the filing date, interference, or double patenting, whether the name reflected as the inventor in the oath and filing documents is that of the true inventor. We see no harm to the public interest in permitting the requested correction, therefore, in the circumstances of the present case. On the contrary, we believe the public interest in the encouragement of candor and honesty, in disclosing innocent and harmless error, would be injured by a rigid application of a mechanical refusal to act in a situation so rare as to have escaped specific statutory treatment.[12]

11. We do not here deal with a non-assigned application or with an assigned application in which the assignee has no interest received from the true inventor.

12. Upon good cause shown, the PTO routinely revives applications which have gone "abandoned" (37 C.F.R. § 1.137 (1976)), issues pat-

ents after the time for payment of the fee therefore (35 U.S.C. § 151 (Supp. V 1975)), and permits the correction of some defects in filing oaths and declarations (35 U.S.C. § 26 (Supp. V 1975)). Apart from its being unique, therefore, the correction sought herein is not as startling as it may at first blush seem.

■ Executive Branch agencies, such as the PTO, having the obligation to carry out their duties under their authorizing statutes, and if they would avoid an exercise of the powers of another Branch, must in almost every case, follow the strict provisions of the applicable statute. Finding no express statutory authorization for the correction here sought, the PTO cannot be expected to have stepped beyond the bounds of the statutes by which it is governed.[13] Courts of the Judicial Branch, on the other hand, having the obligation to administer justice, may on rare occasions be required to delve within the interstices of a statute to do justice, not only to the individual or individuals involved, but to the statutory scheme itself. As expressed by Mr. Justice Holmes, dissenting in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 221, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917):

I recognize without hesitation that judges do and must legislate, but they do so only interstitially; they are confined from molar to molecular motions.

Further comfort may be found, if the same be needed for what may be thought the delicate task at hand, in 1 U.S.C. § 1 (1970):

§ 1. Words denoting number, gender, and so forth.

In determining the meaning of any Act of Congress, unless the context indicates otherwise—

words importing the singular include and apply to several persons, parties, or things;

words importing the plural include the singular; * * *.

The salutary rule of construction that "words importing the plural include the singular" may in the present circumstances be applied within the interstices of the third paragraph of 35 U.S.C. § 116:

Whenever a person is joined in an application for patent as joint inventor through error, or a joint inventor is not included in an application through error, and such error arose without any deceptive intention on his part, the Commissioner may permit the application to be amended accordingly, under such terms as he prescribes.

■ Thus, words imparting the plural ("joint inventor") i. e., a plural inventive entity, may be construed to include a singular inventive entity, i. e., a sole inventor, particularly when it is recalled that § 116 is "remedial in nature and as such should be liberally construed in order that 'errors' may be readily rectified." *In re Schmidt*, 293 F.2d 274, 279, 48 CCPA 1140, 1148, 130 USPQ 404, 409 (1961).[14]

Congress having provided for the correction of innocent error in stating the inventive entity when the application is filed, whether that entity be singular or plural, we see no rational reason to discriminate against the correction of the same innocent error involving sole inventors and their assignees, or to impute that intent to Congress.[15] Though applied to §§ 116, 256,

13. The present Commissioner has cautioned, however, against a purpose-defeating application of statutory authority:

In this context, the only things that are really matters of substance are whether the invention is new, useful and unobvious and whether it is adequately disclosed in the patent specification. Everything else can be thought of as form. When an invention is new, useful and unobvious and is suitably disclosed, the public has received everything the patent laws are intended to give it in return for the grant of a patent. [C. Marshall Dann, *Form and Substance in Patent Matters*, 57 J.Pat.Off.Soc'y 202, 203–04 (1976).]

14. *Accord, Patterson v. Hauck*, 341 F.2d 131, 138, 52 CCPA 987, 997, 144 USPQ 481, 488 (1965).

15. The board quoted part of a sentence from P. J. Federico's *Commentary On The New Patent Act*, 35 U.S.C.A. p. 1, at p. 28 (1954), in which Mr. Federico was referring to "Patent Office practice," *not* to the statute. The full sentence is:

Patent Office practice permits the simultaneous omission of an erroneously joined person and addition of an erroneously omitted inventor in an application; thus an application filed by A and B as joint inventors can under the appropriate circumstances be amended to become an application of A and C as joint inventors, but an application filed by A as inventor, or by A and B as joint inventors cannot be amended to become an application of C as inventor, either by one or two steps.

Judge Holtzoff's cogent observation respecting the non-crucial nature of the listed inventive entity is of particular interest here:

> [T]he patent law does not regard as crucial the question whether an invention is the product of several joint inventors, or of a sole inventor. A misjoinder or nonjoinder of joint inventors, does not invalidate a patent. An error in that respect may be corrected, either by the Commissioner of Patents or by the Court, by an amendment striking out or adding the name of an inventor, 35 U.S.C. §§ 116, 256. [*Monsanto Co. v. Kamp*, 269 F.Supp. 818, 824, 154 USPQ 259, 262 (D.D.C. 1967).]

## CONCLUSION

The constitutional objectives sought by the patent laws would be best served by a reading of 35 U.S.C. § 116 sufficiently expansive to justify the correction sought in the instant continuation application. The same correction for the same reason, can with respect to U.S. Patent No. 3,691,069 be effected by means of the instant reissue application filed under the remedial reissue provision, 35 U.S.C. § 251 (*supra*, note 7).[16]

Accordingly, we reverse the District Court's order and remand the case to the District Court, with directions to enter an order authorizing the Commissioner of Patents and Trademarks to issue patents on the involved applications upon compliance with all applicable requirements of law.

*It is so ordered.*

---

16. Stoddard could have effected the correction under 35 U.S.C. § 256 (*supra*, note 5), but chose to follow 35 U.S.C. § 251.